JOAN BERNARD ARMSTRONG, Chief Judge.

JjSTATEMENT OF CASE

. On February 6, 2007, the defendant, Joshua Wyatt, was indicted for aggravated arson and the armed robbery and first degree murder of Michael Smoots. The defendant pled not guilty at his arraignment on February 5, 2007. He withdrew *134 his not guilty plea and entered a plea of not guilty and not guilty by reason of insanity on April 24, 2008. On May 5, 2008, the defendant filed a motion for a sanity commission. The trial court granted the motion and appointed Drs. Salcedo, Richoux and Thompson to the sanity commission. After a sanity hearing on October 24, 2008, the trial court found the defendant competent to proceed. On August 5, 2010, the State amended the indictment to charge the defendant with second degree murder. After a jury trial on September 15-20, 2010, the defendant was found guilty of second degree murder, first degree robbery and aggravated arson. On December 15, 2010, the trial court sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on the second degree murder conviction. The defendant was sentenced to twenty years at hard labor on the first degree robbery conviction 12and twenty years at hard labor on the aggravated arson conviction. All sentences were to be served concurrently. The defendant now appeals.

STATEMENT OF FACT

Casey Wyatt, the defendant’s ex-wife, testified that in November 2006, she was in a relationship with Anna Schindler, whom she had met in rehab. Casey and Anna were staying with Jason Wyatt and his family for a short time. On Friday, November 17th, Jason took her and Anna to meet the defendant, Joshua, at European Restorations in Belle Chasse, where Joshua and the victim, Michael Smoots, worked. Jason then drove the three of them to the French Quarter and left them there. They drank heavily and went to a couple of bars. They tried to buy drugs from a random person but the drug deal went bad. The person had given Joshua soap instead of cocaine. Joshua was ranting and raving about the incident so they went back to European Restorations. They continued their party at the warehouse, using alcohol and Valium, which Joshua got from Mike, who lived at the business. At some point, Casey fell asleep. Casey stated that Mike was nice and stayed to himself. When she woke up, they did some target practicing with Mike’s shotgun. Casey testified that Mike never came out of his room and never asked for sex from her or Anna.
Casey testified that on Sunday afternoon she was lying down when she heard a loud gunshot. She went into Mike’s room and saw Joshua running around in a circle screaming. Anna was trying to calm him down. Mike was on the floor. She bent over him and could see that his body was shaking. Casey told them to call the police. Joshua told her not to call the police. Joshua then called a friend who lived out of state. He decided he was going to go out of the state. Casey stated that she does not know why Joshua shot Mike. She vaguely recalled that |sthey were going to rob Mike but did not recall the conversation that was on the message left at her mother’s house. Casey stated she was intoxicated from the pills she had taken. She, Joshua and Anna put Mike’s body in the back of the red truck, which had been left at the business by another employee, and put a blanket over him. The building was burned down but she did not see Joshua set the fire. She stated that the fire was set before they left.
They met Jason at the Sav-A-Center. She and Anna went with Jason to his house. They asked Jason to stop at a couple of places because she and Anna were looking for crack cocaine. They then went to Jason’s house and went to sleep. She did not recall speaking with Joshua later that night. The next morning, she and Anna went to a crack house, where Anna performed sexual favors in exchange *135 for cocaine. She and Anna stole a vehicle owned by Tracy Craddock, a Mend who was also getting drugs with them, and drove to Baton Rouge. In Baton Rouge, they went to places where they knew they could get drugs. They were getting the drugs in exchange for sexual favors. She did not recall using Mike’s credit cards in Baton Rouge. On the day she was arrested, she and Anna had gone to Wal-Mart with a man to steal merchandise to trade for drugs. The man was observed shoplifting and ran out the store. He jumped in their car, and the police chased them until Casey was forced to pull over. Casey testified that she spoke with Detective Plummer on the way back to Plaquemines Parish and told him what happened. She gave another statement when she was back in Plaquemines Parish. She recalled the officer putting her in the same interview room with Joshua. The officers were trying to find out where Joshua had put Mike’s body. However, Joshua did not tell her about Mike. He told her to shut up and wait to talk to his |,[lawyer. Casey acknowledged that taking drugs has caused gaps in her memory. She has not taken any drugs since she was arrested.
Anna Schindler was involved in a relationship with Casey Wyatt in November 2006. They met at a rehab center in Mandeville, Louisiana in December 2005. In November 2006, she and Casey were staying at Jason Wyatt’s house. Joshua called and asked them to go party with him. He also asked Anna if she would help him refinish a piece of furniture. Joshua said she could earn a couple hundred dollars. Jason took Casey and Anna to meet Jason at European Restorations on Friday night. Jason then took them to the French Quarter. They went to a few bars. They met someone who had cocaine. Anna stated that Mike did not go with them to the French Quarter. Mike was quiet and laid back. On Friday night, Joshua was drunk. He was trying to get into fights with people. They gave some man money for cocaine, but he gave them soap instead. Joshua was very upset. They returned to Belle Chasse around 4:00 a.m. on Saturday morning. She did not know how they got back. She took some Valium and Seroquel on Saturday morning and passed out. She slept the entire day and woke up Sunday morning. Both she and Casey slept in Joshua’s bedroom.
Mike was at the shop because she heard Joshua coming in and out of the room, ranting about Mike. Joshua had asked Mike for money, and Mike refused. Anna got up to see where Joshua had gone. She walked to the office doorway and saw Joshua standing behind Mike with a .22 caliber pistol gun to his head. Mike was sitting on a computer chair at the desk, in front of the computer. She saw Joshua shoot Mike. Joshua was cursing when he shot Mike, and then he started screaming and yelling for her to help him. Anna testified that Joshua did not say anything to Mike before he shot him. She did not think that Mike knew Joshua |fiwas standing behind him. There was blood everywhere. Mike slumped forward on the desk. Joshua then put Mike on the floor and rolled him in a blanket that Anna got from another room. They put Mike in the back of the truck. Casey came into the room after Joshua shot Mike. Mike’s two bulldogs were in the room. Joshua wrapped the gun in a towel. Anna and Casey washed their hands and changed their clothes. Joshua started dumping lacquer thinner around the room. Joshua said he was going to burn the place down. Anna said that Casey was in shock. Joshua told the girls that Jason was coming to pick them up.
Anna stated that she did not see Joshua start the fire, but he asked her for a lighter and smelled of lacquer thinner. *136 Joshua then ran from the building and got in the truck. Joshua had Mike’s wallet. He took a couple of credit cards out and gave them to Anna. Joshua also took the rest of Mike’s pills. Joshua did not tell her what he was going to do with the body. They met Jason, who took the girls to his house. Joshua spoke briefly with Jason. The girls spent the night at Jason’s house. The next day Jason took them to Casey’s uncle’s house. They stayed there for a while and then left with another woman, Tracy, to get some drugs at a crack house. Tracy locked her keys in the car and left with someone else. Anna busted the car windows and took the car. She obtained drugs in exchange for sexual favors. Anna stated she used Mike’s credit cards for cigarettes and food. They met a man in Zachary, Louisiana who had a lot of drugs. They went to a hotel with him and shot up cocaine. Later, she and Casey went with him to Wal-Mart. He went in while she and Casey waited in the parking lot. When he came out, he got into the car and told them to go. They drove about twenty yards until they were surrounded by police. At that point, they were arrested for drug paraphernalia and stealing the vehicle.
IcA few days later, Detective Plummer arrived, picked up her and Casey, and charged both of them with arson and cruelty to animals. The officer advised her of her rights. She remained silent until she arrived in Plaquemines Parish. Once they arrived in Belle Chasse, she and Casey were taken to the lockup. She was questioned by Detective Plummer. Anna told the officer what happened. In a second statement, she acknowledged that she saw the shooting. Anna stated that Mike did not “hit” on her or Casey and did not threaten Joshua. She identified the voices on the answering machine as belonging to her, Casey and Joshua. Anna pled guilty to obstruction of justice and theft over five hundred dollars. The murder charge was still pending at the time of Joshua’s trial. The prosecutor made no promises about sentencing. Anna stated that she has no memory from Saturday around 4:00 a.m. to Sunday night. She remembers shooting guns at some point that weekend, but does not remember any phone conversations with Jason.
Jason Wyatt, the defendant’s brother, testified that in November 2006, the defendant’s ex-wife, Casey Wyatt, and her friend, Anna Schindler, were staying with his family in Kiln, Mississippi. On Friday, November 17th, he drove them to European Restorations to meet up with Joshua. Jason drove Joshua and the two women to the French Quarter and then went home. He did not speak with them until Sunday afternoon. He called them to see about picking up the two women. They were supposed to return to his house that evening. Around 6:00 p.m., Joshua called and asked him to pick up the girls. Shortly thereafter, he received another call from Joshua who told him to come into the building through a certain door. Joshua stated that he would not be there, but that the girls would be waiting. Joshua called a third time and asked Jason to meet him at the Sav-A-Center on Behrman Highway. Jason arrived at the Sav-A-Center first. Joshua arrived a few 17minutes later in a red pick-up truck with Casey and Anna. Joshua told Jason that he killed Mike. Joshua said they had gotten into a fight and he had to kill him. Jason told Joshua that it sounded like self-defense and that Joshua needed to go back to the shop and call the police. Joshua said it was too late because he had set the building on fire. Joshua asked Jason to take the girls home with him. He said that the girls knew about the incident but were not involved. Joshua then left. Jason stopped at a Wal-Mart because Anna needed to *137 get something. Casey was very upset and hysterical. Anna, on the other hand, was calm. Casey told Jason that Joshua had killed Mike. They arrived home around 10:30 p.m. Jason testified that he did not know that Joshua had Mike’s body in the back of the truck.
A couple of hours later, Joshua called and asked if he could stay at Jason’s house. Jason told him that he could not stay at his house. Joshua then asked to speak with Casey. After speaking with Joshua, Casey asked Jason to take her and Anna to the Wal-Mart in Picayune, Mississippi, where they were going to meet Joshua. Jason took the two women to Wal-Mart, but Joshua did not show up. They called Joshua, but he did not answer his cell phone. Jason then took Casey and Anna to a friend’s house. When they arrived, the two women went into the residence to see if Joshua was there. After learning that Joshua was not there, they went to another friend’s house to look for Joshua, to no avail. Jason took Casey and Anna to Casey’s mother’s house. Casey stayed at her mother’s house for about ten minutes. The women then asked Jason to take them to the first friend’s house they had gone to earlier. Jason dropped the women off at the house and went home. He went to bed but could not sleep. Jason called his uncle, who was a deputy with the St. Tammany Parish Sheriffs Office. After speaking with his uncle, Jason went to the St. Tammany Parish Sheriffs Office and informed them |sof what Joshua had told him. Jason testified that Joshua had indicated that he shot Mike in the back of the head. Anna told Jason that she was standing next to Joshua when he shot Mike. Anna also said that Mike had a gun and said that if he could not be with Casey, he was going to shoot someone.
Sherry Wyatt is married to the defendant’s other brother, John Wyatt. The defendant came to her house on Monday, November 20th between 7:00 a.m. and 8:00 a.m. He was wearing a gray shirt, boxer shorts and a blue jumpsuit. The defendant said he had been in an accident the night before. He told her that someone ran into the back of his truck and flipped it. The defendant was looking for his brother, but he was not at home. Sherry gave the defendant some clothes. Later that day, she found the clothes that he had on when he arrived at her house on top of her garbage. She put the clothes in a bag because she was suspicious. A day or so later, law enforcement officers showed up and picked up the clothing.
Katricia Wyatt, the defendant’s stepmother, testified that the defendant called her about 10:00 a.m. the morning after the fire. The defendant told her that he had gotten into an accident and the police were looking for him because he was driving while intoxicated. Katricia told the defendant that he needed to go back to the hospital because she had been informed by the defendant’s mother-in-law that the cat scan done after the accident showed that the defendant had a brain tumor. The cat scan had been taken while the defendant was at the hospital getting treatment for his injuries sustained in the car accident he had earlier that morning. Katricia asked the defendant about the fire at European Restorations. The defendant told her that the building had been burned and Mike had been shot. He did not admit to her that he did either. When she asked where Mike was, the defendant said that Mike was gone.
| ¡Katricia spoke with Casey’s sister, Terry Crawford, the same day. Terry told her that there was a message on her mother’s phone from Casey. It was the type of message where the caller does not realize he or she has placed the call, and one hears the background conversation. Ka- *138 trida told the police officers about the message, and she went with them to obtain the tape from Casey’s mother. She went with the officers because the officers did not have directions to Casey’s mother’s house. Katricia also stated that Joshua had been acting strangely in the months prior to the murder. One time, in the middle of the night, the defendant called and told her that he was on Decatur Street in the French Quarter and could not find Casey or Anna. He told her that he was lying on the street. Another time, the defendant called and said that he had been beaten up. Katricia acknowledged that Joshua always struggled with substance abuse.
Fern Darnell, Casey Wyatt’s mother, testified that Joshua came to her house early Monday morning. She made him breakfast. The defendant told her that he did something that he regretted. He stated that he killed someone. After the defendant ate breakfast, Fern’s husband took the defendant to one of the defendant’s friend’s house. Fern stated that she received a call from Casey on Sunday evening but did not answer the call. There was a message on her answering machine as a result of the phone call. In the message, one could hear Casey, Anna and Joshua. The police detectives came to her house and took the answering machine.
Tommy Weaver was the owner of European Restorations in November 2006. He restored and refinished antique furniture. Mr. Weaver had four employees at that time, including Joshua Wyatt and Michael Smoots. The building had accommodations for some of his employees to live there. In November 2006, |10Smoots had been living in the building for over a year and Joshua had been staying there for only a few weeks. Weaver testified that Smoots had worked for him for a couple of years and was a good worker. He identified Joshua at trial and stated that he was also a good worker. Weaver testified that he and Joshua are first cousins. He stated that he had both a cell phone and land line phone at the business. Weaver stated that he received a phone call from Joshua early Sunday morning. Joshua told him that he and Mike were not getting along. Later in the day on Sunday, Joshua called and said that he could not work with Mike. Weaver stated that Mike had previously described Joshua as being cocky but he never complained that Joshua was stealing from him. Weaver found out that his business had been destroyed in a fire when he arrived for work on November 20th. He never heard from Joshua again. The red truck that Joshua was driving belonged to one of Weaver’s other employees. The truck had been left at the business because Weaver was going to buy the truck for Joshua. Weaver stated that Mike had a shotgun that he kept at the business. Weaver also had a pistol that he left at the business.
Deputy Allen P. Jolly, Jr., a reserve duty with the Plaquemines Parish Sheriffs Office, was on patrol the evening of November 19, 2006, when he observed a fire at a building located at 2217 Engineers Road in Belle Chasse. He notified headquarters and went to check on the occupant of the building. He knew that a person lived in the building and that the person had a dog. Deputy Jolly was unable to enter the building because flames were engulfing the building and the ceiling was caving in. The officer then went to check the other buildings in the area to make sure that no one was in the other buildings. Although the buildings were commercial, on two occasions people answered the doors. The officer stated |nthat he knew from prior patrols that on occasion employees stayed at the buildings. Deputy Jolly’s son, who is also a deputy, showed up and helped him.
*139 Detective Brett Hughes, a member of the Plaquemines Parish Sheriffs Office, investigated the fire at 2217 Engineers Road. On November 20, 2006, the officer was notified that the building had been burned and that a dog was possibly burned inside the building. When the officer arrived on the scene, he spoke with Mr. Darryl Bird, the owner of the building adjacent to the building which had burned. The officer learned that the building that was burned had housed a furniture restoration business, European Restorations. The officer went inside the building and found the dead dog. Mr. Bird told the officer that, on November 19th, he had observed the occupant of the building, Michael Smoots, and some friends barbequing and target practicing in the area. Detective Hughes went to his office and tried to contact Tommy Weaver, the owner of European Restorations, to no avail. At approximately 3:00 p.m. that afternoon, Detective Hughes received a phone call from the St. Tammany Parish Sheriffs Office stating that personnel had spoken with Jason Wyatt who told them that his brother, Joshua, may have murdered someone and burned a building in Belle Chasse. Detective Hughes returned to the scene and processed evidence found on the scene. Photographs were taken, sketches of the budding were made and approximately sixty pieces of physical evidence were collected. Detective Hughes and Detective Patrick Harvey interviewed Jason Wyatt. After speaking with Mr. Wyatt, the officer searched for the two women who were with Joshua Wyatt— Casey Wyatt, Joshua’s ex-wife, and her friend, Anna Schindler.
On November 21st, Detective Hughes obtained a search warrant for the building to look for a body. Upon searching the building, he did not find a body, |12but he did find the victim’s two dogs that had been burned to death. The officer returned to St. Tammany Parish to retrieve the truck that Joshua Wyatt had driven and been in an accident on November 19th and 20th. Detective Hughes secured the truck as evidence and had tests performed on the truck, which had substances on it that appeared to .be blood. On November 28th, the officer was notified by the New Orleans Police Department that they had located a body, which was later identified as Michael Smoots.
Officer Chris McClelland, a state trooper assigned to Troop L, responded to a call of an automobile accident on 1-59, north of Pearl River, at approximately 1:30 a.m. on November 20th. The officer arrived on the scene at 1:36 a.m. He observed a red pick-up truck upside down on the right side of the road, and a white Mustang was off to the left side of the road. The defendant, Joshua Wyatt, was the driver of the red pick-up truck. The driver of the Mustang was a Hispanic male. When the officer arrived on the scene, Joshua was walking around the area. The officer took statements from the parties and witnesses, who stated that Joshua’s vehicle was in the right hand lane going northbound on 1-59. The vehicle was emitting a large amount of smoke. The Mustang was also headed northbound in the right hand lane. Because of the smoke, the Mustang did not see the pick-up truck until after the vehicle in front of the Mustang moved into the left hand lane. At that point, the Mustang attempted to veer left but could not avoid colliding with the red pick-up truck.
Officer McClelland testified that Joshua appeared intoxicated. He had an unsteady gait, slurred his speech and had strong odor of alcohol on his breath. The officer conducted a field sobriety test and determined that Joshua was under the influence. Officer McClelland arrested Joshua for driving while intoxicated. At |1sthat point, Joshua indicated that his back was *140 hurting, and he wanted to go to the hospital. Joshua was placed in an ambulance and transported to the hospital. After Joshua was taken to the hospital, the officer continued to process the scene. A wrecker flipped the truck over, and the officer took photographs of the truck. At that time, the officer observed what appeared to be blood in the back of the truck. Officer McClelland called the ambulance and asked the paramedics to ask Joshua if he had a passenger because he saw blood in the truck. Joshua indicated that he had picked up a hitchhiker. The officer then began to search the wooded area in the vicinity of the accident because he thought that someone might be dead. However, he could not And any such evidence. When he could not find a body, the officer called the ambulance again and asked the paramedics if the defendant had any injuries that would cause him to lose a large amount of blood. The paramedics informed Officer McClelland that the only visible injury the defendant had was a small cut on his hand and that injury would not produce that much blood.
After Officer McClelland processed the scene, he spoke with the other driver and witnesses. He then went to the hospital and spoke with Joshua. The officer informed Joshua of his rights. Officer McClelland asked Joshua where the blood in the truck came from. Joshua stated that he had gone hog hunting the previous week and had killed a hog. However, the officer did not believe his story because the blood was too wet. Joshua told the officer that he picked up the hitchhiker at the Shell Station in Pearl River and that the hitchhiker took off walking after the accident. However, no one fitting the description given by Joshua was discovered walking on the highway after the accident. Because the information given by Joshua was questionable, the officer placed a hold on the truck. Officer | ^McClelland then went back on patrol. Later that morning, he was informed by the hospital that Joshua was ready to be released. Before a state trooper could get to the hospital, Joshua fled the hospital. Officer McClel-land later spoke with the St. Tammany Parish Sheriffs Office about the truck. He also subsequently spoke with the Plaquemines Parish Sheriffs Office.
In November 2006, Gus Bethea was a detective with the homicide division of the St. Tammany Parish Sheriffs Office. On the afternoon of November 20th, Detective Bethea interviewed Jason Wyatt, who indicated that his brother was involved in an arson and murder in Plaquemines Parish. The officer contacted the Plaquemines Parish Sheriffs Office and informed them about the statement given by Jason Wyatt. The Plaquemines Parish Sheriffs Office indicated that they had an arrest warrant for Joshua. Detective Bethea then started searching for Joshua through his cell phone usage. He located Joshua at a trader park in Pearl River. The officer relocated to the trailer park and found Joshua inside a trailer at the trailer park. Joshua was arrested at 6:54 p.m. on November 20th. The Plaquemines Parish Sheriffs Office was advised of the defendant’s arrest. Detective Bethea assisted the Plaquemines Parish detectives with the investigation. He went with them to Katri-cia Wyatt’s house to retrieve a voicemail recording. Detective Bethea made a recording from the telephone and burned it onto a CD.
The parties stipulated that if Julie Golden of the Jefferson Parish Regional DNA Laboratory would testify, she would state that the blood sample from the bed of the truck and the blue jumpsuit and white tee shirt recovered from Sherry Wyatt’s house had the victim’s blood on them. The parties also stipulated that the fire marshal’s report indicated that arson was the cause *141 of the fire at European Restorations. There was also a stipulation that if Dr. Richard Tracy, the 115pathologist who performed the autopsy on the victim, would testify, he would state that the cause of death was a gunshot wound to the head. It was stipulated that the New Orleans Police Department found Michael Smoots’ body in a weeded area off the corner of Patterson and Thayer Streets in New Orleans on November 28, 2006.
Detective Mark Plummer, a member of the Plaquemines Parish Sheriff’s Office, received a phone call from the St. Tammany Parish Sheriffs Office around 3:00 p.m. on November 20, 2006. The officer was informed that Jason Wyatt had given a statement to the St. Tammany Parish Sheriffs Office that his brother told him that he killed a man in Belle Chasse and burned down a building. Because he was out of town, Detective Plummer contacted Lt. Troy LeGreeo and informed him of the situation. LeGreeo told Plummer that they were investigating a possible arson on Engineers Road. When he returned on November 22nd, he and the marine division of the Sheriffs Office used a large magnet to search the canals around the business for a murder weapon. However, the murder weapon was not found. On November 28rd, Plummer and LeGreeo went to the St. Tammany Parish Sheriffs Office and spoke with Detective Gus Be-thea. They interviewed several witnesses — Roland Mayfield, Tracy Craddock (the owner of the vehicle stolen by Anna and Casey), and Sherry Wyatt. The officers collected the defendant’s clothes from Sherry Wyatt. DNA and blood samples were taken from the clothes for testing. The tests revealed that Joshua’s DNA, as well as combination of Joshua’s DNA and the victim’s blood, were on the clothes. The officers also went to the Shell Station in Pearl River because the defendant said he had picked up a hitchhiker at the station. They obtained surveillance videos which showed that the defendant was at the station in the red truck, but no one was with him. The officers interviewed Katricia Wyatt and were advised of the existence of the answering |¶ (¡machine recording. They followed Katricia Wyatt to Fern Darnell’s house. They listened to the recording, and Bethea recorded the conversation. Bethea later burned the recording onto a CD. The officers took a statement from Ms. Darnell.
On November 24th, Detective Plummer continued looking for the body. He obtained arrest warrants for Joshua, Anna and Casey for aggravated cruelty to animals, aggravated arson and unauthorized use of a vehicle. The officer was advised on November 27th that Anna and Casey had been apprehended in East Baton Rouge Parish, and that Tracy Craddock’s vehicle was impounded there. Detective Plummer and Detective Patrick Harvey met Tracy Craddock in St. Tammany Parish and obtained her consent to search the vehicle. The officers went to Baton Rouge and searched the vehicle. They collected evidence found in the vehicle, including the victim’s credit cards and Anna’s Louisiana identification card. The officers then had Anna and Casey released to their custody. Detective Plummer kept the two women apart. Casey gave the officer a statement on the way back to Belle Chasse. When they returned to Belle Chasse, he took a statement from Anna and then re-interviewed Casey. He still did not know where Smoots’ body was located, so he put Casey and Joshua in an interview room together in hopes of learning the location of the body. Joshua did not tell Casey where he put Smoots’ body. Detective Plummer booked Anna and Casey with arson and aggravated cruelty to animals. Smoots’ body was found on November 28th.
*142 Detective Plummer was contacted by the manager of the Friendly Fred’s service station and informed that the manager found another receipt from the victim’s credit card. The receipt indicated that the card was used after Smoots’ death. The officer went to Pearl River to collect the receipt. While there, he was |17contacted by the New Orleans Police Department that a body of a white male, with a small gunshot to the back of the head, had been found in Algiers. Detective Plummer called Detectives Hughes and Harvey, who went to the scene. When Detective Plum-mer arrived on the scene, the area was being processed. The body was found on the corner of Patterson and Thayer Streets. The body was identified as Michael Smoots through fingerprints and DNA samples. Detective Plummer then obtained arrest warrants for Joshua, Anna and Casey for first degree murder, armed robbery and obstruction of justice. The New Orleans Police Department turned over the evidence found on the scene on December 4th.
Debbie Staley, the sister of the victim, testified that her brother was an easy going, simple and honest man.
Dr. William Gouvier, a clinical psychologist and neuropsychologist, testified as the defendant’s expert witness. He evaluated the defendant twice, for a total of ten hours. He also interviewed the defendant’s father, step-mother and ex-wife. The defendant had a nonmalignant menin-gioma tumor in the layers covering the brain. It was located along the midline on the front side of the right inside half of the brain. Post-surgery, the defendant showed evidence of sensory and motor dysfunction affecting the left hand. Dr. Gouvier stated that he believed the defendant has both a mental defect due to the post-surgical removal of the tumor, and a mental disease resulting from his poly-substance abuse. He testified that the defendant has a below average intelligence. The witness also noted that the defendant has memory deficits and was diagnosed with attention deficit disorder as a child. Dr. Gouvier testified that the defendant told him that he had severe headaches for several months prior to the incident and still has headaches. The witness stated that the defendant had two seizures while incarcerated. Dr. Gouvier |]8opined that the tumor would have an effect on the defendant’s behavior. The tumor could have been responsible for the severe headaches. Symptoms associated with frontal lobe dysfunction include apathy, lack of inhibition and executive dysfunction. A person with frontal lobe dysfunction would more likely to get into fights, say ugly things, and do things without thinking. The witness speculated that the defendant’s tattoos of “Think” and “Focus” above his eyes were an indication that the defendant knew something was wrong. Dr. Gouvier acknowledged that alcohol abuse would have similar effects as frontal lobe injury. Alcohol and the tumor would have made the defendant even more impulsive and out of control. Dr. Gouvier believes that Joshua does not have the executive function and intelligence to keep himself out of situations where he cannot stop himself from doing something wrong. Dr. Gouvier acknowledged that he knew that the defendant was evaluated by court appointed experts for a sanity hearing but did not consult with these experts. The witness also admitted that the headaches the defendant had could have occurred from being hung over. Dr. Gouvier also recognized that the defendant had long standing behavior problems, long before the brain tumor, and that these problems were worsened by the defendant’s use of alcohol and drugs.
Dr. Richard Richoux, a forensic psychologist and member of the sanity commis *143 sion appointed by the trial court, testified in rebuttal. In October 2008, he was appointed by the trial court as part of the sanity commission to determine the defendant’s competency to proceed. At that time, defendant had no signs of a major mental illness except for a long history of substance abuse and chemical dependency. The defendant had no difficulty in understanding the legal proceedings and was able to assist his lawyer. It was the recommendation of the |19sanity commission that the defendant was competent to proceed. The witness was aware of the defendant’s brain tumor at the time of the examination in October 2008. The tumor had no apparent influence on the defendant’s behavior during the examination. Dr. Richoux also evaluated the defendant in May 2010, after the tumor was removed, for the competency to proceed. The sanity commission recommended to the trial court that the defendant was competent to proceed. There was no difference in the defendant’s mental makeup before and after the tumor. Dr. Richoux testified that he heard Dr. Gouvier’s findings, but did not believe the findings have much significance. While some symptoms or abnormalities may show up on neuropsychological testing, they do not present themselves in an obvious way in simply interacting with the individual. The kinds of abnormalities which usually produce an inability to distinguish right from wrong are abnormalities that are quite apparent on clinical examination. Dr. Richoux stated that if one accepted Dr. Gouvier’s findings, the findings do not indicate that the defendant did not know right from wrong. DISCUSSION

ERRORS PATENT AND ASSIGNMENT OF ERROR NUMBER 3

A review of the record for errors patent reveals that the trial court imposed illegally lenient sentences on the defendant’s convictions for first degree robbery and aggravated arson. La. R.S.14:51 provides in pertinent part that “[w]hoever commits the crime of aggravated arson shall be imprisoned at hard labor for not less than six nor more than twenty years, and shall be fined not more than twenty-five thousand dollars. Two years of such imprisonment at hard labor shall be without benefit of parole, probation or suspension of sentence.” La. R.S. 14:64.1 states that anyone convicted of first degree robbery “shall be imprisoned at hard |2nlabor for not less than three years and for not more than forty years, without benefit of parole, probation or suspension of sentence.” The trial court failed to note that the first two years of the defendant’s sentence for aggravated arson must be served without benefit of probation, parole or suspension of sentence. The trial court also failed to state that the defendant’s entire sentence for first degree robbery was to be served without benefit of probation, parole or suspension of sentence.
Nevertheless, paragraph A of La. R.S. 15:801.1 provides that in instances where the statutory restrictions are not recited at sentencing, they are contained in the sentence, whether or not imposed by the sentencing court. State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790. Hence, this Court need take no action to correct the trial court’s failure to specify that the defendant’s sentences be served without benefit of parole, probation or suspension of sentence. The correction is statutorily effected. La. R.S. 15:301.1(A).
The defendant also notes in his third assignment of error that the trial court failed to advise him of the time limits for post-conviction relief as provided in La.C.Cr.P. article 930.8. A review of the sentencing transcript reveals that the defendant is correct. The language of La. *144 C.Cr.P. article 930.8 requiring the trial court to inform the defendant of the delays for filing post-conviction relief is merely precatory and does not bestow an enforceable right upon an individual defendant. State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197, p. 21 (La.9/5/95), 660 So.2d 1189, 1201; State v. Handy, 2000-0061, p. 5 (La.App. 4 Cir. 1/24/01), 779 So.2d 103, 105. However, in the interest of judicial economy, we note for the defendant that La.C.Cr.P. art. 930.8 generally requires that applications for post-conviction relief be filed within two years of the finality of a 121 conviction. Handy; State v. Adams, 2004-2177 (La.App. 4 Cir. 6/29/05), 909 So.2d 5.

ASSIGNMENT OF ERROR NUMBER 1

The defendant contends that the trial court erred when it allowed Dr. Richoux to testify at trial. At trial, the defendant objected to Dr. Richoux’s testimony under the physician — patient privilege. The defendant stated that Dr. Richoux treated him in 2009. The trial court overruled the defendant’s objection but noted it for the record. The defendant assigned as error in his appellate brief that the trial court erred when it allowed the state’s witness, Dr. Richoux, to testify about the issue of insanity at the time of the offenses.
In his appellate brief, the defendant does not argue this issue, but contends that the jury was not rational in its finding that he was not insane at the time of the offense. The State contends that the defendant is barred from arguing the jury’s finding because he did not assign the issue as an assignment of error.
La.C.Cr. P. article 844(A) provides that the “party appealing shall file with the appellate court a written designation of those errors which are to be urged on appeal and furnish a copy to the trial judge and counsel.” La.C.Cr.P. article 841(A) states that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence.”
Because the defendant did not brief the issue of physician-patient privilege, the issue is not properly before the court. “Any specification or assignment of error not briefed is considered abandoned.” State v. Anderson, 97-2587, pp. 9-10 (La.App. 4 Cir. 11/18/98), 728 So.2d 14, 20, citing Rule 2-12.4, Uniform Rules Courts of Appeal, State v. Holmes, 95-2249, p. 15 (La.App. 4 Cir. 10/29/97), 701 So.2d 752, 760. Rule 2-12.4 states, in pertinent part, that “[a]ll specifications or ^assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed.”
Nevertheless, a review of the defendant’s argument reveals that it is without merit. La. C.E. article 510 provides for the health care provider-patient privilege. However, an exception to the privilege exists in a criminal proceeding, “[w]hen the communication is relevant to an issue of the health condition of the accused in any proceeding in which the accused relies upon the condition as an element of his defense.” La. C.E. article 510(C)(2)(a). In the present case, the defendant raised the issue of his sanity when he pled not guilty and not guilty by reason of insanity. Thus the exception applies, and the trial court did not err when it allowed Dr. Richoux to testify.
The defendant argues in his brief that the jury was not rational in concluding that the defendant was sane at the time of the crime.
This court set forth the applicable law on the insanity defense in State v. Currie, 2000-2284 (La.App. 4 Cir. 2/13/02), 812 So.2d 128, as follows:
*145 In Louisiana, a legal presumption exists that a defendant is sane at the time of the offenses. La. R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, the defendant must show he suffered a mental disease or mental defect which prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Williams, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. All the evidence, including expert and lay testimony, along with the defendant’s conduct and action, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. State v. Bibb, 626 So.2d 913 (La.App. 5th Cir.1993), writ denied, 93-3127 (La.9/16/94); 642 So.2d 188; State v. Claibon, 395 So.2d 770 (La.1981).
* * * * * ⅜
In reviewing a claim for insufficiency of evidence in an action where an affirmative defense of insanity is raised, this court, applying the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Peters, 94-0283 (La.10/17/94); 643
So.2d 1222; State v. Nealy, 450 So.2d 634 (La.1984); State v. Price, 403 So.2d 660 (La.1981); State v. Claibon, supra; State v. Roy, 395 So.2d 664 (La.1981).
Currie, 2000-2284, pp. 16-17, 812 So.2d at 137-138, quoting State v. Silman, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32.
In the case at bar, the jury’s verdict was appropriate. The defendant bore the burden of proving that he was insane at the time of the crime, that is, he had to prove, beyond a reasonable doubt that he did not know right from wrong at the commission of the crime. The defendant did not meet his burden. The jury was presented with expert testimony from Dr. Gouvier and Dr. Riehoux. Dr. Gouvier stated that he believed that the defendant suffered from both a mental defect, i.e. the effects of the brain tumor, and a mental disease resulting from his poly-substance abuse. Dr. Gouvier opined that because of these conditions, the defendant did not have the executive function and intelligence to keep out of situations where he becomes impulsive and out of control. However, Dr. Gouvier never stated that at the time of the murder and arson, the defendant did not know right from wrong.
Further, the jury was presented with the testimony of Dr. Riehoux, who stated that the brain tumor had no apparent influence on the defendant’s behavior during his clinical examinations. He testified that while some symptoms or ^abnormalities may show up on neuropsychological testing, such symptoms or abnormalities do not present themselves in an obvious way in simply interacting with a person. Dr. Riehoux stated that even if Dr. Gouvier’s findings were accepted, the findings do not indicate that the defendant did not know right from wrong. Dr. Riehoux explained that the kinds of abnormalities which usually produce an inability to distinguish *146 right from wrong are abnormalities that are quite apparent on clinical examination.
The jury chose to believe the testimony of Dr. Richoux over that of Dr. Gouvier, and there is no showing that it abused its discretion in so finding. A determination of the weight of evidence is a question of fact which rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. See State v. Bibb, supra; State v. Claibon, supra. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. State v. Silman, supra.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2

In this assignment, the defendant contends that there was insufficient evidence to support his conviction for aggravated arson because there was no testimony that it was foreseeable that human life might be endangered.
La. R.S. 14:51 defines aggravated arson as “the intentional damaging by any explosive substance or the setting fire to any structure, watercraft, or moveable, whereby it is foreseeable that human life might be endangered.” In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most ^favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green, supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
The State produced sufficient evidence for the jury to conclude that it was foreseeable that human life might be endangered. There was testimony to establish that there were people in the vicinity of the fire whose lives could have been endangered. Deputy Jolly testified that upon seeing the fire, he checked the other buildings for occupants. There were people in two businesses located near the building. The officer stated that he knew from prior patrols that on occasion employees stayed at the buildings. Further, the deputy’s own life could have been endangered because he attempted to enter the burning building to locate the occupant. The officer could not enter because the flames were engulfing the building, and the ceiling was caving in.
12fiDetective Hughes’ testimony also acknowledged that people were in the area when the defendant started the fire. Detective Hughes stated that Mr. Bird, the owner of the building adjacent to European Restorations, was at his building on November 19th and saw Mike and the others barbequing and target practicing. Tommy Weaver stated that the defendant had been living at the building for a few *147 months. Thus, the defendant would have known that there were people in the area when he started the fire.
This assignment is without merit.
For the foregoing reasons, we affirm the defendant’s convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED
MURRAY, J., concurs in the result.