STATE OF LOUISIANA        *        NO. 2019-KA-0682

VERSUS        *

SHERMAN HAMPTON        *        COURT OF APPEAL

       *        FOURTH CIRCUIT

       *        STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 519-042, SECTION "F"
Honorable Robin D. Pittman, Judge
* * * * * *
**JAMES F. MCKAY III**
**CHIEF JUDGE**
* * * * * *

(Court composed of Chief Judge James F. McKay III, Judge Tiffany G. Chase, Judge Dale N. Atkins)

LEON CANNIZZARO, JR.
DISTRICT ATTORNEY ORLEANS PARISH
DONNA R. ANDRIEU
CHIEF OF APPEALS
IRENA ZAJICKOVA
ASSISTANT DISTRICT ATTORNEY
619 S. White Street
New Orleans, Louisiana 70119
       COUNSEL FOR STATE/APPELLEE

HOLLI HERRLE-CASTILLO
LOUISIANA APPELLATE PROJECT
P. O. Box 2333
Marrero, Louisiana 70073-2333
       COUNSEL FOR DEFENDANT/APPELLANT

     **CONVICTIONS AND SENTENCES AFFIRMED IN PART;**
     **VACATED IN PART; REMANDED**

          **JULY 1, 2020**

**JFM**
**TGC**
**DNA**

On January 20, 2014, defendant was charged via grand jury indictment with four counts of aggravated rape in violation of La. R.S. 14:42. Count one charged defendant with the aggravated rape of C.F., committed on June 28, 1992. Count two charged defendant with committing aggravated rape upon V.D. on May 20, 1995. Count three pertained to the alleged aggravated rape of N.G. on April 17, 2003. Finally, count four charged defendant with committing aggravated rape upon L.J. on May 31, 2003. On February 5, 2014, defendant appeared for arraignment and entered pleas of not guilty.

Defendant filed a motion to exclude DNA evidence and a motion requesting a *Daubert* hearing regarding the DNA testing that was performed. Upon hearing the matter, the trial court determined that the State met its burden under *Daubert,* and the DNA evidence was deemed admissible.

Prior to trial, defendant filed a number of pre-trial motions, including a motion for individual sequestered *voir dire*, a motion to declare La. C.Cr.P. art. 782(A) and La. Const. art. I, Section 17 unconstitutional, and a motion for a unanimous jury verdict. On April 7, 2017, the trial court denied all three motions.

1

Trial by jury commenced on February 11, 2019, with *voir dire* proceedings. A verdict was returned on February 14, 2019. On count one, the jury unanimously found defendant guilty as charged of aggravated rape. On count two, by a vote of ten to two, the jury found defendant guilty as charged of aggravated rape. With regard to count three, by a vote of eleven to one, the jury found defendant guilty of simple rape. Finally, with respect to count four, the jury unanimously found defendant guilty as charged of aggravated rape.

Defendant filed a motion for new trial and for post-verdict judgment of acquittal. A motion to vacate the non-unanimous jury verdicts was also filed. Both motions were denied. Defendant waived sentencing delays. The court imposed life sentences for the three aggravated rape convictions, without the benefit of parole, probation, or suspension of sentence, and imposed a sentence of twenty-five years for the simple rape conviction. All sentences were ordered to run concurrently, with credit for time served. Defendant's appeal followed.

## STATEMENT OF FACTS

Regarding count one, Detective Joseph Gaines, III, testified that twenty-two of his years in law enforcement were spent investigating sex crimes. On June 28, 1992, he was called to the scene of a reported rape. Gaines stated that he was unable to locate the abandoned apartment where the victim reported that the rape had occurred. However, the area where the victim was found was around St. Thomas and Jackson Avenue, where the "new Walmart Supermarket" was located. The victim was transported to Charity Hospital where a "sexual assault examination" was performed. On cross-examination, Gaines could not recall if the victim was able to provide a description of her attacker.

2

C.F., the victim of the June 28, 1992 rape, was called as a witness. She stated that at the time of the incident, she was living with her mother in the "St. Thomas project." She explained that on June 28, 1992, it was about 4:00 or 5:00 a.m. and she was outside waiting for a bus. A man came up behind her and placed what felt like a gun behind her head. He instructed her to walk backwards and he took her to an abandoned building. She remembered that he tied her up and raped her. After he was finished, the perpetrator "stuck tissues up inside of me."

C.F. recalled the police contacting her approximately two years ago to report that they caught the man who raped her. The police asked if she knew someone named Sherman Hampton. She recalled her attacker giving her his name and she remembered that the first name was "Sherman," but she could not remember the last name.

Regarding count two, Detective Alan Gresset testified that he was retired from the NOPD, but during the last twelve years of his employment, he worked in the sex crimes unit. On May 20, 1995, he participated in the investigation of a rape of V.D. Referring to his report, Gresset recalled transporting the victim to Charity Hospital. He explained that protocol was for police to have "a standard rape kit" which would be turned over to the doctor assigned to examine the rape victim. Gresset recalled that a "sexual assault exam" was performed on V.D. Thereafter, the "rape kit" was secured.

Gresset stated that the rape took place in the 2100 block of Third Street, but he was unable to garner any suspects as a result of his investigation. V.D. was able to describe the clothing the suspect was wearing, but could not describe the facial features of her assailant for the purpose of drawing a composite sketch.

3

V.D.'s cousin testified. She stated that on May 20, 1995, V.D. was living with her. She stated that V.D. came home from work, hysterical and crying, stating that she had been raped. While V.D. wanted to take a bath, she insisted that they call the police; she wanted the police to get "a DNA rape kit on her."

V.D. testified that on May 20, 1995, she was living on Third Street with her cousin. She explained that she left work late that night and was taking a bus home. Her apartment was two blocks from the bus stop. To get to her apartment, she had to walk down a hallway and it was in that hallway that she was attacked.

When the rape was over and her assailant gone, she ran to her apartment and her cousin called the police. The police took her to the hospital where she allowed a doctor to "take a rape kit."

Regarding count three, Detective Michael McCleary testified that on April 17, 2003, he was working in the sex crimes unit. On that date, he was assigned to assist in the investigation of a rape, which occurred at 4221 Freret Street in New Orleans. McCleary stated that he interviewed the victim then "took her to Charity Hospital for a sexual assault kit." On cross-examination, McCleary stated that "the only description [the victim] could give was a black male in dark clothing." Detective Jacobs, who investigated the matter with McCleary, concluded that a "crime did not occur."

N.G. testified that on April 17, 2003, she was living on Freret Street with her mother. N.G. stated that she was asleep and later, when she "woke up," a stranger was in the bedroom with her. The intruder told her that if she screamed, he would kill her. Thereafter, he proceeded to get in bed with N.G., told her to "take my shorts off," then "he got on top of me and put his penis half-way in me, and molested me." When he was finished, he instructed N.G. to "wipe myself," and

4

while she pretended to go to the bathroom to do as he instructed, she "didn't wipe myself." After he left, N.G. called her mother who, upon arriving at the home, contacted police.

N.G. stated that one of the police officers investigating the crime did not seem to believe her version of events. However, N.G. "went to the hospital; did a kit and everything." A "couple of years later," officials called to inform her that they had "a match."

Detective Jounay Ross testified that she was currently assigned to the NOPD Sex Crimes Unit. She stated that in 2008, she received a "Hit letter" from the Louisiana State Police informing that Sherman Hampton's DNA was found in connection with two rapes. At that point, Ross located the original case files associated with the May 1995 rape of V.D. and the April 2003 rape of N.G. Thereafter, Ross began her search for the victims. In response to Ross's questioning, both victims stated that they wanted to pursue prosecution of their assailant. Thereafter, Ross obtained an arrest warrant for Sherman Hampton.

Regarding count four, Sergeant Clifton Neely testified that he spent thirteen years as a detective and three years as a supervisor in the NOPD Sex Crimes Unit. On May 31, 2003, he responded to an aggravated rape report in the 2100 block of South Liberty Street. When he arrived on the scene, the victim, L.J., was visibly upset. He explained that officers could not do much of an investigation because the victim could not provide a physical description of her assailant. She was only able to describe the clothing he was wearing. L.J. explained that she could not provide a description because "the room was dark" and she "kind of woke up to him being on top of her." She stated that he held a knife to her throat and threatened to "cut her if she made any sounds." L.J. further stated that she would

5

not be able to recognize her attacker if she saw him again. Neely testified that the victim "was taken to the hospital for examination."

L.J. testified that on May 31, 2003, she was living in the 2100 block of South Liberty Street with her three children. She recalled that she was sleeping on a mat and she woke up when a person got on top of her, holding a knife to her throat. The room was dark, she could not see her assailant, but she remembered him threatening to cut her throat if she made any noise. She was then raped. After he left, L.J. woke up her cousin, I.H., who was asleep in the same room. She told her cousin what happened and then called the police. The police questioned her and brought her to the hospital where a doctor took swabs from different parts of her body.

A few years after the rape, L.J. remembered getting a phone call from a detective informing her that there was a DNA match. She informed the officer that she did not have consensual sex with her assailant and that she wanted to prosecute him.

L.J.'s cousin testified that she was staying with L.J on the night of the rape. She was twelve years old at the time. She was awakened after the attack took place, explaining that L.J. was crying. She stated that the attacker had a knife and put a sock in L.J.'s mouth, explaining why L.J. was quiet during the rape. Thereafter, L.J. called the police.

Sergeant James Kelly testified that from 2008 to 2013, he was assigned to the NOPD Sex Crimes Unit. He stated that in 2008, he received what Detective Ross described as a "Hit letter," informing that Sherman Hampton had been linked to the rape of L.J. Kelly contacted L.J. who informed him that she wanted to pursue charges against Hampton. Kelly sought a warrant for Hampton's arrest.

Sergeant Corey Lymous testified that he was presently assigned to the NOPD Child Abuse Unit. He stated that in 2013, he applied for and obtained a search warrant for a buccal swab from defendant. He explained that once the buccal swab was collected, a request was made for the Louisiana State Police to test the sample. The purpose of the buccal swab was to verify evidence that had already been obtained from the sexual assault kits.

Blake Arcuri testified that he was the general counsel and the custodian of records for the Orleans Parish Sheriff's Office. Arcuri stated that he was familiar with defendant, having located two of his prior addresses; one at 2324 Delachaise Street, and the other in the St. Thomas project.

Anne Montgomery testified that she worked as lab director at a research and development lab called InnoGenomics. Montgomery reviewed her curriculum vitae, explaining that during her career she aided in the establishment and accreditation of the NOPD DNA lab. She explained that she was the DNA technical leader for the NOPD crime lab, having testified as an expert over one hundred times. Without objection, Montgomery was qualified as an expert in the field of molecular biology and DNA analysis.

Montgomery stated that the NOPD DNA lab became accredited in 2003, and had a tremendous backlog of sexual assault kits that had not been processed for DNA. Because NOPD had only a few analysts, the lab outsourced the backlogged cases to accredited private laboratories, including ReliaGene Technologies.

Montgomery testified that DNA lab results confirmed that all four of the unsolved rape cases at issue here were matched to Sherman Hampton. She was "highly confident" of the test results.

7

Gina Pineda Murphy testified that she was a consultant in the field of DNA testing and human identity. She stated that she began her professional career at ReliaGene Technologies, a private accredited DNA facility located in New Orleans. She estimated that she testified as an expert in several states, as well as in Canada and Australia, more than one hundred and fifty times. Murphy was qualified, without objection, as an expert in microbiology and DNA analysis.

Murphy stated that at ReliaGene Technologies she became the DNA technical leader and assistant lab director until she left the company in 2007. She recalled receiving "in the early 2000s" numerous backlogged sexual assault kits from the NOPD. Murphy testified that the testing on the pertinent four cases was performed on different dates and, at the time, ReliaGene Technologies had no idea who the perpetrator was. The lab did not know that the cases were related; the results were simply provided to the NOPD. She explained that the lab's job was to extract the woman's DNA in the vaginal swab from the male sperm donor profile and provide a report about those two profiles.

Phillip Simmers testified that he was a DNA analysist at the Louisiana State Police Crime Laboratory. Simmers was accepted, without objection, as an expert DNA analyst.

Simmers testified that his laboratory received "two oral reference swabs" from defendant, which were used to generate a DNA profile. In turn, this was compared to the DNA profile obtained from ReliaGene Technologies. Based on the comparison, Simmers concluded that "the probability of finding the same deduced DNA profile if the DNA had come from an unrelated random individual other than [defendant] was approximately one in 2.97 quadrillion for the black population."

8

## LAW AND ANALYSIS

### *Errors Patent*

A review of the record reveals that the sentence the trial court imposed in connection with defendant's simple rape conviction was illegally lenient. The court sentenced defendant to serve twenty-five years imprisonment, but omitted the requirement that the sentence be served "without benefit of parole, probation, or suspension of sentence." La. R.S. 14:43. Nevertheless,

> This Court has recognized that "paragraph A of La. R.S. 15:301.1 provides that in instances where the statutory restrictions are not recited at sentencing, they are contained in the sentence, whether or not imposed by the sentencing court." *State v. Wyatt,* 2011-0219, p. 20 (La. App. 4 Cir. 12/22/11), 83 So.3d 131, 143 (citing *State v. Williams,* 2000-1725 (La. 11/28/01), 800 So.2d 790). Accordingly, "this Court need take no action to correct the trial court's failure to specify that the defendant's sentences be served without benefit of parole, probation or suspension of sentence" because it is statutorily effected. *State v. Wyatt,* 2011-0219, p. 20, 83 So.3d at 143 (citing La. R.S. 15:301.1(A)).

*State v. Dominick*, 2013-0270, pp. 3-4 (La. App. 4 Cir. 1/30/14), 133 So.3d 250, 252. Thus, this Court is not required to take any action as this error is statutorily self-correcting.

### *Assignment of Error No. 1:  Defendant's Sixth Amendment rights were violated when the trial court failed to excuse the second jury panel.*

Defendant argues that the trial court erred in failing to excuse the entire second venire panel. Defendant contends that a prospective juror's mistaken belief that he had attempted to assault her infected the panel such that no member could adjudicate his guilt impartially. Shortly after the second panel was called up for *voir dire*, prospective juror #39 stated that she may know defendant and asked to speak with the judge in chambers. The court obliged, bringing her, along with

9

counsel, into chambers for questioning. Prospective juror # 39 informed the court that she thought defendant may be the person who attempted to assault her in September 2018. After revealing this information, she was sent back to the courtroom with instructions not to discuss the matter. Thereafter, it was ascertained that defendant could not have been the perpetrator because he was incarcerated in September 2018. Both the defense and the State challenged the juror for cause, and she was removed.

The court called prospective juror # 39 back into chambers to inform her that she was excused and to ascertain whether she had shared her views with anyone else. She answered in the affirmative, stating that she spoke with prospective jurors, # 38 and 46.

The court then called prospective juror # 38 into chambers. She confirmed that she had spoken with prospective juror # 39 about defendant being her possible assailant. She further informed the court that prospective juror # 37 overheard their conversation. At that point, prospective juror # 38 was excused for cause.

The court next called prospective juror # 37 who confirmed that she overheard the discussion. She stated that she did not share this information with any other prospective jurors. She further stated that she looked the defendant up on the internet during a break. The court excused prospective juror # 37, advising her to return to the jury lounge and not to discuss the matter.

Defense counsel requested, "that the entire panel be either excused or they be polled individually." The court agreed to poll the entire second venire panel individually. The court then advised counsel regarding what the scope of its questioning would be, stating: "And so I want to be very crafty about this. Because I don't want to give them information so I'm just going to ask them have

10

they heard anything about Mr. Hampton or this case. And that's it." Defense counsel lodged no objection to the court's decision to individually question the second venire panel members rather than excusing them; nor did counsel object to the scope of the questioning.

Prospective juror # 46, was questioned in chambers. When asked if she knew the defendant, she stated that she had read about the case. When asked whether she had engaged in a conversation about the defendant, she answered affirmatively, stating that another prospective juror thought defendant may have assaulted her. Prospective juror # 46, stated that she did not share this information with any other venire member. Pursuant to defense counsel's questioning, she stated that this conversation regarding defendant took place outside, a conversation strictly between herself and prospective juror # 39 while they were smoking on the courthouse steps. The court excused prospective juror # 46.

One prospective juror that was questioned informed the court that he "overheard some chatter" to the effect that a prospective juror had been assaulted by defendant. He stated that he could not be impartial not because of what he overheard; but rather, because he had been molested as a child. He was released from the jury.

The record reflects that another fifteen prospective jurors were questioned individually. They were asked if they heard anything about the case from any source, including other prospective jurors. They were asked if they knew anything about the defendant or knew anything about the allegations in the case. Each prospective juror stated that they did not know defendant and were not aware of the allegations in the case. Neither the defense nor the State asked any questions

11

of the venire members and all were instructed not to share what transpired within chambers with their fellow prospective jurors.

Thereafter, the court called up the eleven jurors that had already been chosen from the first venire panel (the panel that had not been exposed to prospective juror # 39's mistaken allegation against defendant). The trial court collectively asked if they knew defendant; if any prospective juror had conversed with them regarding defendant or possible allegations of the case; or if they had learned about the case via independent research. They all responded in the negative.

As noted above, defense counsel did not object when the trial court opted to individually question the second venire panel rather than excuse the panel. Moreover, defendant did not object when the court explained what questions would be asked of potential jurors. After each line of questioning by the court, defense counsel was asked if he wanted to ask any other questions. The record reflects that defense counsel only asked questions of prospective juror # 46 regarding her conversation with prospective juror # 39. Upon being informed that the conversation was held outside, away from others, defense counsel was apparently satisfied that no other venire member heard this particular conversation. At no point, did defense counsel question prospective jurors about whether they heard allegations against defendant beyond the allegations set forth in the instant case. Despite this failure to make such an inquiry or to object to questions posed by the judge, defendant now complains that the individual questioning by the court was deficient.

As this Court explained in *State v. Pollard*, 2014-0445, p. 13 (La. App. 4 Cir. 4/15/15), 165 So.3d 289, 299, "[u]nless an irregularity or error is objected to at the time of occurrence, it cannot be complained of after verdict. La. C.Cr.P. art.

12

841. A simultaneous objection is required so that the trial court can rule accordingly and cure or prevent any potential error. Thus, on appeal, the defense is limited to those grounds raised at trial." (citations omitted).

Not only did defense counsel not object to the individual questioning of the second venire panel, the individual questioning was performed at his request. Thus, he failed to preserve on appeal his argument that the individual *voir dire* questioning tainted the proceeding. Further, defense counsel did not object when the trial court informed what the scope of the individual questioning would be. When given an opportunity to possibly expand the questioning, he was silent. This failure to object to the questioning precludes defendant from arguing on appeal that the questioning should have been expanded.

In any event, defendant's claim, that the panel was tainted as a result of potential juror # 39's unfounded allegation against defendant, is without merit. As reflected above, all of the potential jurors who heard this claim were excused from the jury pool. Any potential prejudice stemming from the claim was eliminated. In a similar case, *State v. Carmouche,* 2001-0405, p. 17 (La. 5/14/02), 872 So.2d 1020, 1033, a prospective juror made a remark regarding a sanity test taken by the defendant. At that point, *voir dire* proceedings were halted and venire members were questioned as to whether they would be prejudiced against the defendant as a result of the reference to sanity testing. The two jurors who stated, behind closed doors, that they heard the remark and were adversely affected, were excused. In determining that the trial court acted properly in denying the defendant's motion to strike the entire venire panel, the Court noted that defendant "bears the burden of proving the grounds for setting aside the venire." *Id.,* 2001-0405, p. 19, 872 So.2d at 1035. (citations omitted).

13

In this case, as in *Carmouche*, each potential juror was "thoroughly examined" to determine if they were prejudiced against defendant. *Id.* Each venire member who heard prospective juror # 39's remark about defendant was excused for cause. All of the remaining venire members stated that they did not know defendant and had no knowledge of the allegations lodged against him. On the record before us, we find that the trial court did not abuse its sound discretion in opting to individually question the venire members rather than excusing the entire panel. This assignment of error is without merit.

***Assignment of Error No. 2: The two convictions obtained by non-unanimous jury votes are in violation of the Sixth Amendment.***

As noted above, on count two, defendant was found guilty as charged of aggravated rape by a vote of ten to two. With regard to count three, the jury found defendant guilty of simple rape by a vote of eleven to one. Defendant contends that his constitutional rights under the Sixth Amendment to the United States Constitution were violated by the lack of a unanimous verdict on counts two and three. We find merit in this assignment of error.

While this appeal was pending, the United States Supreme Court announced a new constitutional rule in *Ramos v Louisiana*, --- U.S. ---, 140 S.Ct. 1390, --- L.Ed.2d --- (2020) (holding that jury verdicts in state felony trials must be unanimous). Because defendant's appeal is pending on direct review, the Supreme Court's decision in *Ramos* applies here. *See Schriro v Summerlin*, 542 U.S. 348, 351, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004) (observing that "[w]hen a decision of [the United States Supreme Court] results in a 'new rule,' that rule applies to all criminal cases still pending on direct review").

14

**DECREE**

For the foregoing reasons, defendant's convictions and sentences on counts one and four are affirmed. Defendant's convictions and sentences on counts two and three are vacated, and the case is remanded to the trial court for further proceedings.

**CONVICTIONS AND SENTENCES AFFIRMED IN PART; VACATED IN PART; REMANDED**