STATE OF LOUISIANA       *       NO. 2023-KA-0520

VERSUS       *       COURT OF APPEAL

JAMES JEFFERSON       *       FOURTH CIRCUIT

      *       STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 551-321, SECTION "C"
Honorable Benedict J. Willard, Judge
* * * * * *
**Chief Judge Terri F. Love**
* * * * * *
(Court composed of Chief Judge Terri F. Love, Judge Roland L. Belsome, Judge
Rosemary Ledet)

Jason Rogers Williams
District Attorney, Orleans Parish
Brad Scott, Chief of Appeals
Zachary M. Phillips
Assistant District Attorney
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR STATE/APPELLEE


Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
1538 Short Street
New Orleans, LA 70118

      COUNSEL FOR DEFENDANT/APPELLANT

      **CONVICTIONS AND SENTENCES AFFIRMED**
      **February 8, 2024**

Defendant, James Jefferson, was convicted of second-degree murder, a violation of La. R.S. 14:30.1; two counts of felon in possession of a firearm, violations of La. R.S. 14:95.1; and armed robbery with a firearm, a violation of 14:64.3. The victim of the second-degree murder was Jamonta Johnson ("the decedent") and the victim of the armed robbery was the decedent's younger sister, Jimmice Johnson ("Jimmice"). The murder and armed robbery offenses were separate incidents that occurred on different dates. On appeal, Defendant contends the evidence was insufficient to support a conviction on the second-degree murder charge and the felon in possession of a firearm charge involving the decedent's shooting death.

In reviewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found Defendant guilty of second-degree murder and a felon in possession of a firearm. Accordingly, we affirm Defendant's convictions and the sentences imposed.

## RELEVANT PROCEDURAL AND FACTUAL HISTORY

The State charged Defendant with second-degree murder, two counts of felon in possession of a firearm, armed robbery, and obstruction of justice. The

1

second-degree murder charge and the felon in possession of a firearm charge—count three—resulted from the decedent's shooting death, which occurred on April 16, 2019. The armed robbery charge and the felon in possession of firearm charge—count five—arose from the March 23, 2019 robbery of Jimmice. Defendant entered not guilty pleas to all the charges.

In connection with the armed robbery of Jimmice, co-defendant, Jonathan Bush ("Bush"), was charged with armed robbery committed with the use of a firearm and felon in possession of a firearm in the same indictment. The charges against Bush were resolved through a plea agreement with the State prior to trial.[1]

The trial court denied Defendant's motion to sever the murder-related charges from the armed robbery offenses. This Court denied supervisory writ review.[2]

Defendant opposed the State's motion to introduce the statement of a deceased witness, Shantrell Reese—Defendant's former girlfriend—pursuant to La. C.E. art. 804(B)(7).[3] The trial court ruled the statement was admissible. This

---

[1] Bush pled guilty to an amended count of conspiracy to commit armed robbery and the State dismissed the felon in possession of a firearm charge.

[2] *See State v. Jefferson*, 2021-0329 (La. App. 4 Cir. 6/2/21).

[3] Louisiana Code of Evidence art. 804(B)(7) provides the following:

> **(7)(a) Forfeiture by wrongdoing.** A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

> (b) A party seeking to introduce statements under the forfeiture by wrongdoing hearsay exception shall establish, by a preponderance of the evidence, that the party against whom the statement is offered, engaged or acquiesced in the wrongdoing.

Court and the Supreme Court denied writs. [4]  Thereafter, the trial on the merits took place.

*Trial Testimony Summation*

The underlying facts developed through testimony adduced at trial included the following. [5]

**Detective Joseph Jefferson**

Det. Jefferson, the lead homicide detective in the decedent's April 16, 2019 murder, testified that he received a call after midnight regarding the shooting and arrived on the scene around 12:45 a.m.  Det. Jefferson identified the photographs of the crime scene and the decedent's body.  Det. Jefferson verified that the decedent was shot as he attempted to enter his apartment.  He found no indication that the decedent had a gun on his person and did not find a gun in decedent's car.

Det. Jefferson stated that he canvassed the area; however, he was unable to locate any eyewitnesses to the homicide.  While on the scene, Det. Jefferson testified that a "guy just came up to [his] car" and told him there was "a suspicious person in the area."  However, "this guy" did not see the face of the suspicious person because a hoodie was pulled over his head and face. The suspicious person was not identified and Det. Jefferson did not believe that he was involved in the murder. The guy who approached Det. Jefferson also was not identified.   Det.

[4] *See State v. Jefferson*, 2021-0643 (La. App. 4 Cir. 11/12/21).  *See also State v. Jefferson*, 2021-01691(La. 11/16/21), 327 So.3d 506.

[5] The parties stipulated to the authenticity of the six audio 911 calls that the State introduced into evidence.  The callers reported that a black male had been shot multiple times outside his apartment complex.

Dr. Cynthia Gardner, the expert forensic pathologist who performed the decedent's autopsy, testified that the decedent suffered four gunshot wounds through his body that were "in and out;" the decedent's body showed no signs of a recent physical altercation; and the shots were fired greater than two feet from the decedent.

3

Jefferson averred that although three semi-automatic casings were recovered, the weapon used in the homicide was never located.

Det. Jefferson testified that he interviewed the decedent's mother, an older sister, and the decedent's girlfriend, Feltralynn Hall, on April 19, 2019. Det. Jefferson learned from Ms. Hall that she had received an Instagram message sent from an account bearing the name "Tootsiereloaded." [6] The message indicated that the decedent's death was related to an armed robbery of Jimmice that had occurred a few weeks before the homicide. Det. Jefferson discovered that the decedent had "facilitated" the two individuals believed to have robbed Jimmice to do some carpentry work at Jimmice's music studio.

Det. Jefferson testified that a "cell phone dump" obtained from the decedent's cell phone showed that he had pictures of Bush and Defendant in his phone. The decedent's possession of these photographs indicated to the detective that the decedent wanted to do something about his little sister's robbery. The State introduced the photographs of Defendant and Bush which were recovered from the decedent's cell phone. The name "Jonathan Bush" was written under Bush's photograph.

Det. Jefferson testified that he obtained a surveillance video taken on March 23, 2019, at the storage facility location where Jimmice was robbed. The video, which was played for the jury, depicted Defendant entering the facility before Jimmice's arrival. After Jimmice's arrival, Defendant followed in a separate

---

[6] Det. Jefferson later determined that the "Tootsiereloaded" account belonged to a woman named Lashonda Cotton, a cousin of a former friend of Ms. Hall. Det. Jefferson said that he was never able to speak to Ms. Cotton. Neither Ms. Cotton nor Ms. Hall testified at trial.

elevator. When Defendant departed the storage facility, the video showed Defendant carrying bags similar to the ones Jimmice had upon her arrival.

After Det. Jefferson's initial testimony, he was later called to testify regarding his interview of Shantrell Reese, Defendant's deceased girlfriend, with whom Defendant shared a child.[7]

### Det. Jefferson's Testimony Re: Statement of Shantrell Reese

Det. Jefferson learned from Fourth District Officers that Ms. Reese had information concerning the decedent's homicide. He said that he first obtained direct knowledge of Defendant through his interview of Ms. Reese.

Defendant objected to the State's introduction into evidence of the audio of Ms. Reese statement. However, the State pointed out the trial court's previous ruling that Ms. Reese's statement was admissible under La. C.E. art. 804(B)(7) because the preponderance of the evidence established that her unavailability for trial—her murder—resulted from Defendant's wrongdoing. The State cited Ms. Reese's text messages to a friend in which she relayed, in part, that "I need you to take care of my kids. I'm being threatened. James keeps calling me, harassing me, sending me letters saying I better not appear in court. And I'm scared but God got me." The State then played the audio recording of Ms. Reese's statement to the jury after the trial court overruled Defendant's objections.

Ms. Reese's statement began with her announcement that "I'm not showing up to court." She stated, "[i]t was a robbery. They robbed a young man's sister."

---

[7] Det. Jefferson also testified in his initial testimony that on the night before the murder, a friend of the decedent picked the decedent up at the dealership where the decedent worked, driving decedent's vehicle. The friend had borrowed the decedent's car. The two then drove to the residence of a relative of the friend, at which point the friend retrieved his vehicle. The decedent then followed the friend to the friend's home, and later, the decedent went to his residence. Det. Jefferson said he spoke to the friend and the decedent's co-workers and failed to uncover anything "suspicious."

She stated that "it didn't make it to the police" because it was "a drug situation." Ms. Reese said that she didn't know either the "young man who got killed" or his sister. She stated that she "just [knew] what her baby daddy [told her]."

Ms. Reese said that on the evening of the murder, Defendant called and told her "to go outside and see if there are any police lights in Parc Fontaine."[8] Ms. Reese said that at the time, she lived close to Parc Fontaine. When Ms. Reese went outside, she could see flashing lights. She stated that after she told Defendant that police lights could be seen, he replied, "[i]t's done." She asked Defendant what he meant by that comment. He answered, "[w]e got him. We killed the dude."

Ms. Reese stated that Defendant later "came inside" around "twelve something," after "they put the guns up." She emphasized that Defendant said, "[w]e got him. The dude got out of his car, he was walking up to his door. He turned around, he was just like, '[w]hat's up?'" She guessed that the decedent was killed thereafter. Ms. Reese was of the opinion that the sister must have known that the decedent was going to retaliate and surmised that Defendant killed the decedent as a preemptive action to avoid retaliation by the decedent as a result of Jimmice's armed robbery.

Ms. Reese told Det. Jefferson that she could tell him "what kind of weapon it was." She said it was "an AR, or some type of chopper. It was a big gun." She believed that two guns were used in the homicide, but said that she "knew it was his work" because he had called her and then returned to the house and "told [her] about it." Ms. Reese maintained that the gun had been in the house and was under the bed at one time.

---

[8] The name of decedent's apartment complex was "Parc Fontaine or "Rue Parc Fontaine."

Towards the end of the interview, Ms. Reese identified Defendant through his driver's license photograph provided by Det. Jefferson. However, Ms. Reese refused to sign the photograph. She stated that she and Defendant had been living together at the time of the murder. Ms. Reese did not provide any details about their domestic dispute, but said that she was aggravated and that she "wanted her baby."

Det. Jefferson confirmed that the photograph Ms. Reese had identified as Defendant matched the photograph of Defendant depicted on Defendant's certified conviction packet. Det. Jefferson verified that the conviction packet showed Defendant had previously pled guilty to armed robbery and illegal possession of stolen things. Det. Jefferson added that he subpoenaed Defendant's phone records based on the telephone number provided by Ms. Reese.

Det. Jefferson stated that Ms. Reese provided information that had not been generally released to the media, such as Jimmice's robbery by two men, the fact that a rifle— a choppa—was used in the murder—and that the murder occurred as the decedent was entering his residence. He also noted that Defendant's phone records verified that he called Ms. Reese around the time frame provided by Ms. Reese.

On cross-examination, Det. Jefferson acknowledged that the information regarding Jimmice's robbery had been known to family members. He also said Defendant had physical custody of Ms. Reese's and Defendant's baby, who was about a week old at the time of the interview. Det. Jefferson confirmed that Ms. Reese said that she wanted her baby back and said she would "play dirty." Det. Jefferson also testified that there was only one type of bullet casing found at the

scene and that the homicide happened after midnight, not around 11:00 p.m. as deduced by Ms. Reese.

On re-direct examination, Det. Jefferson provided that Ms. Reese's statement established that Defendant was not home at the time of the shooting. He explained that Ms. Reese never said with certainty that two different types of bullets had been used in the shooting; instead, that comment was made in an "off-hand" manner. Det. Jefferson expounded that Ms. Reese had also used midnight and 1:00 a.m. references in describing the time frame and events surrounding the shooting. He confirmed that Ms. Reese could see lights from near where the murder took place based on her location. Det. Jefferson maintained that although Ms. Reese did not expressly tell him why she did not want to come to court, about four other people with knowledge of the murder indicated they were too scared to testify or talk to Det. Jefferson.

**Jimmice Johnson**

Jimmice testified that she produced music. On March 23, 2019, she was building a music recording studio on the sixth floor of a storage facility on Tulane Avenue. She had hired a person she knew as "Two," later identified as Bush, to complete construction on the studio. She testified that the decedent had arranged for "Two" to paint walls and put floors down in the studio.

Jimmice identified herself on the surveillance video. She testified that she arrived at the storage facility alone. She brought a purse and a bag containing her portable speaker. Jimmice heard a knock on the door shortly after her arrival. She opened the door and saw Defendant and Bush. Jimmice said Bush was carrying a "smaller weapon." Defendant carried an assault rifle, which he held with two hands. Jimmice testified that the two rushed into the studio. Defendant held her

8

down while Bush hit her on both sides of her head with his weapon, and she fell to the floor.

Jimmice testified that Defendant and Bush took her purse and $2000 in cash from her pockets. Bush told her that the next time he saw her he would kill her, and then the two men left. She asserted that Defendant carried her bag, booksack, and a briefcase when he left.

Jimmice explained that she did not call the police; she was afraid because the two men had threatened to kill her. About two weeks after the robbery, she said the decedent was killed. Jimmice relayed that she spoke to Det. Jefferson two or three times. The detective showed her photographs, which she "matched. . . with what [she] recognized."

On cross-examination, Jimmice conceded that she had "no personal knowledge" as to who killed her brother. She described the assault rifle carried by Defendant as half the length of her body and acknowledged that in the surveillance video, Defendant did not appear to be carrying the rifle as he exited the elevator. She suggested that Bush may have carried the assault rifle out of the storage facility as Bush was not seen leaving the scene on the video.

**Maria Tucker, Ph.D.**

Dr. Tucker, an NOPD crime analyst, testified as an expert in the area of "historical cell site analysis and cellphone record analysis." Dr. Tucker analyzed Defendant's cell phone records beginning on April 15, 2019 through April 18, 2019. She testified that during that period, Defendant's cell phone was "primarily in the Algiers area everywhere from right around the location of [decedent's apartment complex], as well as slightly more towards the highway." About an hour before the murder, she said that Defendant's phone was detected around the

decedent's address. At the time of the homicide, about 12:20 a.m., Defendant's phone was not in use. Dr. Tucker explained that she could not "say anything about the specific location when [the phone] is not in use." Dr. Tucker confirmed that at 12:28 a.m. on April 16, 2019, Defendant placed a call from his phone to Ms. Reese's phone. The call was made from the Algiers area, within the area between decedent's apartment complex and the expressway.

On cross-examination, Dr. Tucker testified that she was not aware that the Defendant's residence was slightly less than a mile from decedent's address.

### Susan Hurst

The State called Ms. Hurst, a finger print expert with the Louisiana State Police, to testify as a prosecution witness. Ms. Hurst asserted that Defendant's fingerprints matched those relating to Defendant's 2008 convictions for armed robbery and possession of stolen things included in the certification packets the State had introduced into evidence. [9]

### Jury Verdict/Post-Trial Proceedings

After a four-day trial, Defendant was found guilty as charged of second-degree murder, two counts of felon in possession of a firearm and armed robbery with a firearm. The jury hung on the obstruction of justice charge related to the homicide investigation.

Defendant's motion for new trial on each of the convictions and his motion to set aside the verdict as contrary to the law and evidence were denied. On the same date of the denial, the trial court sentenced Defendant to life imprisonment

---

[9] The decedent's mother, Doris Jones Anderson, also testified. She said that she was the mother of ten children, including the decedent and Jimmice. She testified that the decedent "had some mishaps" and had served time at Angola. She said that while serving time, the decedent earned many certificates "because he wanted to come out and be a productive citizen."

without benefits for the second-degree murder conviction and twenty years imprisonment at hard labor for each of the two counts of felon in possession of a firearm, to run concurrently to all counts. The trial court also sentenced Defendant to serve fifty years imprisonment at hard labor for armed robbery with a firearm, also to run concurrently, and imposed an additional five years under La. R.S. 14:64.3, to run consecutively.

The trial court granted Defendant's motion for an appeal.

**ERRORS PATENT**

The record herein reflects that the trial court did not observe the twenty-four hour delay before sentencing, as required by La. C.Cr.P. art. 873 after denial of Defendant's motion for new trial. However, Defendant expressly waived the time delay and did not challenge his sentence as excessive. As such, any error in failing to observe the sentencing delays as allotted in La. C.Cr.P. art. 873 is deemed harmless; and accordingly, this Court is not required to vacate Defendant's sentences and remand for resentencing. *See State v. Scott*, 2023-0022, p. 5 (La. App. 4 Cir. 8/30/23), 372 So.3d 42, 49.

The record also reflects that the trial court failed to specify that Defendant's sentences for his convictions of felon in possession of a firearm and armed robbery, as well as the five-year armed robbery enhancement, were to be served without benefit of parole, probation, or suspension of sentence, as required by law. *See* La. R.S. 14:95.1(B); La. R.S. 14:64(B); La. R.S. 14:64.3(A).

This Court has applied the following analysis when statutory restrictions are not recited at sentencing:

> "[P]aragraph A of La. R.S. 15:301.1 provides that in instances where the statutory restrictions are not recited at sentencing, they are contained in the sentence, whether

11

> or not imposed by the sentencing court." *State v. Wyatt*, 2011–0219, p. 20 (La. App. 4 Cir. 12/22/11), 83 So.3d 131, 143 (citing *State v. Williams*, 2000-1725 (La. 11/28/01), 800 So.2d 790). Accordingly, "this Court need take no action to correct the trial court's failure to specify that the defendant's sentences be served without benefit of parole, probation or suspension of sentence" because it is statutorily effected. *State v. Wyatt*, 2011–0219, p. 20, 83 So.3d at 143 (citing La. R.S. 15:301.1(A)).

*State v. Dominick*, 2013-0270, pp. 3-4 (La. App. 4 Cir. 1/30/14), 133 So.3d 250, 252. Thus, this Court is not required to take any action on the trial court's error in not expressly citing the sentencing restrictions as the error is statutorily self-correcting.

We now review Defendant's assignment of errors.

## DISCUSSION

Defendant's assignments of error contend that the evidence was insufficient to convict on the second-degree murder charge and the related offense of felon in possession of a firearm.

### *Standard of Review-Sufficiency of the Evidence*

Generally, when assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This review must include consideration of the whole record, as a rational fact finder would do. *State v. Gibson*, 2015-0682, p. 13 (La. App. 4 Cir. 1/27/16), 186 So.3d 772, 780.

The appellate court's role does not encompass assessing witness credibility or reweighing the evidence. *State v. Barbain*, 2015-0404, p. 8 (La. App. 4 Cir. 11/4/15), 179 So.3d 770, 776-77. Hence, the reviewing court does not decide whether it believes a witness or if the conviction is contrary to the weight of the evidence. *See Gibson*, 2015-0682, p. 13, 186 So.3d at 780. Rather, credibility determinations and the weight attributed to the evidence fall within the province of the fact finder. *State v. Rainey*, 2015-0892, p. 9 (La. App. 4 Cir. 1/27/16), 189 So.3d 439, 444. Any conflicting testimony regarding factual matters goes to the weight of the evidence, not the sufficiency of evidence. *Id.* A single witness' testimony, if believed by the fact finder, is sufficient to support a factual finding unless the testimony shows an internal contradiction or irreconcilable conflict with the physical evidence. *See State v. Williams*, 2011–0414, p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771.

We now apply these precepts to Defendant's second-degree murder and felon in possession of a firearm convictions.

### *Second-Degree Murder*

Second-degree murder is defined in pertinent part as "the killing of a human being: (1) when the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. Louisiana Revised Statute 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his **failure to act**." "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *Id.*

Defendant's insufficiency of the evidence claim as to the second-degree murder conviction argues that the State's case rested entirely on Ms. Reese's

unsubstantiated claims. He maintains Ms. Reese's statement was unreliable and cites the State's failure to produce an eyewitness to the shooting and the lack of physical evidence linking Defendant to the shooting.

Defendant acknowledges that the testimony of a single eyewitness may be sufficient to establish guilt; however, without citing to any authority, he suggests that the witness must be an eyewitness. He maintains that not only was Ms. Reese not an actual eyewitness, but her statement revealed that she was completely wrong in placing the time of the murder at 11:00 p.m. and also wrong in her belief that the shooting involved two types of bullets. As such, he urges that these alleged inconsistencies presented an irreconcilable conflict with the evidence developed about the shooting, and consequently, her overall statement is insufficient to support his second-degree murder conviction.

Defendant also supports his insufficiency of the evidence claim by arguing that the State's evidence did not establish his physical presence at the crime scene. He points out that Dr. Tucker, the State's cell phone record tracking analyst, could not provide a specific location of Defendant's phone at the time of the crime. He argues that Dr. Tucker's testimony which detected Defendant's phone around the decedent's apartment complex "backfired" when Dr. Tucker admitted on cross-examination that she was not aware that Defendant lived just .8 miles from the decedent's address.

The State counters that its evidence clearly supported a finding that Defendant killed the decedent on April 16, 2019. The State primarily highlights Ms. Reese's statement regarding Defendant's admission that he killed the decedent. Additionally, the State emphasizes that Ms. Reese's text messages demonstrated Ms. Reese felt threatened by Defendant; and moreover, Ms. Reese's

14

unavailability for trial as a result of her homicide was attributed to Defendant's wrong-doing. The State references Det. Jefferson's testimony that the Instagram message sent to Ms. Allen, the decedent's girlfriend, indicated that retaliation for Jimmice's robbery was the motive for decedent's murder. The State also asserts that notwithstanding Defendant's contention that he lived near the decedent, that Dr. Tucker's geolocation tracking of Defendant's cell phone nevertheless placed Defendant in the area of the decedent's apartment complex near the time of the murder. Additionally, Dr. Tucker's analysis verified Defendant's phone call to Ms. Reese shortly after the murder.

Upon review, we find the evidence the State introduced at trial was sufficient for a rational fact finder to convict Defendant pursuant to the *Jackson* standard enunciated herein. The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Accordingly, a sufficiency of the evidence review considers whether the State's case was so lacking that it should not have been submitted to the jury. *See Musacchio v. United States*, 577 U.S. 237, 243(2016). We do not find that to be the case in the instant matter.

Here, the State introduced evidence of Defendant's admission that he killed the decedent and Ms. Reese's text messages, which directly implicated Defendant in her death. Defendant contends that alleged inconsistencies in Ms. Reese's account of the murder and Ms. Reese's alleged domestic dispute with Defendant rendered her statement unreliable. However, we re-emphasize that "[c]redibility determinations, as well as the weight to be attributed to the evidence are soundly

15

within the province of the trier of fact." *State v. Scott*, 2012-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508.

Moreover, Defendant's argument that he rebutted the State's phone tracking evidence that had him near the decedent's address to prior to the murder is unpersuasive. Defendant raises this argument to suggest that his proximity to the decedent was not dispositive because he lived in the same vicinity as the decedent. However, the fact that Defendant and the decedent may have lived in the same vicinity did not foreclose a reasonable inference reached by the jury that Defendant's proximity to the decedent on the night of the murder evidenced Defendant's involvement in the murder. In support of this inference, the State cited Ms. Reese's statement that Defendant was not at his residence at the time of the shooting and Defendant's documented cell phone call to Ms. Reese shortly after the shooting.

Upon review, Defendant has made no showing that the evidence was insufficient to convict Defendant of second-degree murder. Therefore, this assignment of error lacks merit.

**Felon in Possession of a Firearm**

In this alleged error, Defendant reiterates that Ms. Reese's statement was insufficient to convict on the felon in possession of a firearm charge, maintaining the State offered no evidence that he was seen with a firearm and stressing that the murder weapon was not found.

To convict a defendant of possession of a firearm by a convicted felon the State must prove beyond a reasonable doubt that the defendant: (1) possessed a firearm; (2) was previously convicted of an enumerated felony; (3) possessed the firearm within ten years of the previous conviction; and (4) had the general intent

to commit the offense. La. R.S. 14:95.1; *State v. Fields*, 2012-0674, p. 6 (La. App. 4 Cir. 6/19/13), 120 So.3d 309, 315.

"Actual possession of the firearm is not necessary to prove the possession element of La. R.S. 14:95.1; constructive possession is sufficient." *State v. Fields*, 2012-0674, p. 6, 120 So.3d at 315. A person is in constructive possession of a firearm if it is subject to his dominion and control. *State v. Johnson*, 2003-1228, p. 5 (La. 4/14/04), 870 So.2d 995, 998. The facts of each case determines whether the proof is sufficient to establish possession. *State v. Harris*, 1994-0970, p. 4 (La. 12/8/94), 647 So.2d 337, 338-39. Guilty knowledge may be inferred from the circumstances and proved by direct or circumstantial evidence. *Johnson*, 2003-1228, p. 5, 870 So.2d at 998. Well-settled jurisprudence requires that when circumstantial evidence forms the basis of a conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Shapiro*, 431 So.2d 372, 378 (La. 1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This statutory test comports with the *Jackson* constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury. *See State v. Rosiere*, 488 So.2d 965, 968 (La. 1986).

Here, it is uncontested that the decedent was killed by a firearm. Ms. Reese's statement included her representation that Defendant said "[w] e got him; we killed the dude." Ms. Reese's statement also maintained that Defendant and another person returned after the murder to her shared residence with Defendant to

17

"put the guns up." She maintained that she had seen Defendant's gun previously and described the gun as "a choppa, a big gun."

As with the second-degree murder conviction, Defendant suggests that the underlying evidence surrounding his conviction on the felon in possession of a firearm charge was unreliable, and at best, circumstantial. However, when considering circumstantial evidence, the trier of fact has the authority to decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled, or compromised; and the weight and effect to be given to each permissible inference. *State v. Spears*, 2005-0964, p. 3 (La. 4/4/06), 929 So.2d 1219, 1222 (citations omitted). In the instant case, the jury found that the only reasonable inference to be drawn from Ms. Reese's statement is that Defendant was logically in possession of a firearm at the time he intended to commit the offense of murder. Defendant presented no competing inference or objective countervailing evidence to contest the State's evidence. Thus, Ms. Reese's statement, which the jury found credible, was sufficient evidence to satisfy the first element—possession—and the fourth element—intent—required to convict for felon in possession of a firearm.

Next, the testimony of Susan Hurst and the State's introduction of the certification packets reflecting Defendant's prior convictions for armed robbery and possession of stolen things, satisfied elements two and three to prove felon in possession of a firearm: a prior conviction of an enumerated felony and possession of the firearm within ten years of the previous conviction. Ms. Hurst's testimony identified Defendant as the individual having a prior conviction for armed robbery and possession of stolen things in 2008 referenced in the certification packets. Hence, the State proved that Defendant was previously convicted of the requisite

enumerated felony and that Defendant's possession of the firearm involved in the decedent's April 2016 murder was within ten years of the previous 2008 convictions. Accordingly, this assigned error also is not meritorious.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant has not shown that he is entitled to relief on his claims that the evidence was insufficient to convict. Accordingly, we affirm Defendant's convictions and the sentences imposed.

**CONVICTIONS AND SENTENCES AFFIRMED**